GUITAR HOLDING COMPANY, L.P., Appellant/Cross–Appellee,

v.

HUDSPETH COUNTY UNDERGROUND WATER CONSERVATION DISTRICT NO. 1, Appellee/Cross–Appellant,

v.

CL Machinery Company and Cimarron Agricultural, Ltd., Appellees.

No. 08–04–00296–CV.

Court of Appeals of Texas, El Paso.

Aug. 31, 2006.

Joseph L. Hood, Jr., Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, for Guitar.

John C. Steinberger, El Paso, Max Renea Hicks, Austin, for Hudspeth County Underground Water Conserv.

Lambeth Townsend,Lloyd Gosselink Blevins Rochelle Baldwind & Townsend, PC, Austin, for Cimarron & CL Machinery.

C.R. Kit Bramblett, Bramblett & Bramblett, P.C., Guy N. Fields, III, The Fields Law Firm PC, H. Keith Myers, Mounce, green, Myers, Safi & Galatzan, El Paso, Jeffrey B. Thompson, Granbury, Mark N.

Osborn, Kemp, Smith, El Paso, for Intervenors.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

### OPINION

DAVID WELLINGTON CHEW, Justice.

This appeal arises from the implementation of groundwater regulations by Appellee Hudspeth County Underground Water Conservation District No. 1 ("the District") under its purported statutory authority under Chapter 36 of the Texas Water Code. On appeal, Appellant Guitar Holding Company, L.P. ("Guitar L.P.") contends the District exceeded its statutory authority under Chapter 36 when it adopted new rules for transfer permits that discriminate against similarly-situated landowners and rules for production permits that limit production based on a specific historic use period. Guitar L.P. also complains that the District's new transfer rules violate its equal protection rights under the United States and Texas Constitutions. In addition, Guitar L.P. claims that the District violated its vested rights by considering its permit applications under the new rules, rather than the old rules that were in effect when Guitar L.P. initially filed its applications, an action that it asserts is contrary to the Vested Rights Statute in Section 245.002 of the Texas Local Government Code. In a limited cross-appeal, the District challenges the trial court's denial of its attorney and expert fees, as well as the costs incurred in preparing the administrative record, and the court's ruling in favor of Guitar L.P. on Guitar L.P.'s claim for a refund of administrative fees. The District also argues that the trial court erred in apportioning partial court costs against the District. We affirm in part, and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The Bone Spring–Victorio Peak Aquifer (the "BS–VP Aquifer" or "the Aquifer") produces groundwater for a region in west Texas commonly referred to as the Dell Valley located in northeast Hudspeth County. Prior to 1947, the Dell Valley area was primarily the site of cattle ranching. However, in the years that followed, an intense irrigated agricultural industry developed in the region, which led to a marked increase in the use of its groundwater for irrigation purposes. In the mid-1950s, the Hudspeth County Commissioners Court, by a petition followed by a confirmation election, created the District to conserve and protect the BS–VP Aquifer. Irrigation pumpage in the Dell Valley area peaked in the late 1970s, during which time pumpage exceeded recharge, resulting in a decline in the water table elevation for the BS–VP Aquifer. During the 1980s, irrigation pumpage diminished somewhat and water levels remained relatively constant, however, by the mid-1990s, water levels once again faced a downward trend.

In 1990, the District enacted Rules ("the 1990 Rules" or "old Rules"), which established a permitting system for drilling, equipping, or altering the size of a well and a certification process for validating existing wells within the district. Under the 1990 Rules, the allowable rate for each water well within the district was limited to five acre-feet of water per year, regardless of the proposed use of the water. However, the 1990 Rules placed stringent restrictions on the transport of groundwater for use outside the district. In 1998, the Board of the District adopted its groundwater management plan pursuant to Chapter 36 of the Texas Water Code. The State Auditor's Office audited the District's implementation of its certified groundwater management plan in 2000 and determined that the District had failed to meet its plan objectives and thus, was "not operational" and in violation of the provisions of the Code.

By March 2002, the District had developed a new management plan, which was later certified by the Texas Water Development Board. According to the 2002 management plan, the best available information suggests that 63,000 acre-feet per year is the long-term average amount of groundwater available for consumptive use or transfer from the District from the BS–VP Aquifer. Effective May 31, 2002, the District repealed its 1990 Rules and adopted new rules (the 2002 "Rules") regarding groundwater regulation within the district, which are now the subject of this appeal.

Guitar L.P.'s history in the region began in 1924 when John Guitar, Sr. purchased over 52,000 acres of land in the Dell Valley. Between the 1940s and 1960s, many parts of the Guitar family's land was irrigated, but since that time period, the land has been used primarily for cattle ranching. In 2002, Guitar L.P. was formed to manage the property, which today consists of approximately 38,296 acres, situated within the boundaries of the district. There are fifteen existing groundwater wells on the property, nine of which Guitar L.P. asserts have been used for irrigation purposes.

On May 14, 2002, Guitar L.P. filed an application for validation certificates for the fifteen existing wells, an application for fifty-two new water well drilling permits,[1] and an application for a permit to transfer

---

**1.** Pursuant to an existing Rule 11 Agreement of the parties, Guitar L.P.'s drilling permits are not at issue in this appeal.

water. Despite Guitar L.P.'s requests, the District processed its validation and transport permits under the 2002 Rules, not the 1990 Rules. After an evidentiary hearing, the District issued validation and transport permits to Guitar L.P., which, based on the production limits established under the 2002 Rules that *inter alia* designate an existing and historic use period, resulted in issuance of a validation permit for 57.96 irrigated acres, authorizing annual production of between 174 and 232 acre-feet of water depending on the level of the BS–VP Aquifer. The District also issued a transport permit authorizing Guitar L.P. to transport its water held under the validation permit out of the district. Appellees Cimarron Agricultural Ltd. ("Cimarron"), CL Machinery Company ("CLM"), the Rascoes, Robert L. Carpenter, Gail Carpenter, and Triple B. Farms had also applied for validation and transport permits, however, their permitted amounts of water production and its subsequent transport were significantly greater than Guitar L.P.'s permits despite Guitar L.P.'s much larger property holdings within the district. This was due to Appellees prior use of groundwater during the designated existing and historic use period under the 2002 Rules.

In four separate administrative appeals to the 205th Judicial District Court of Hudspeth County, Guitar L.P. challenged the facial validity of the District's adoption of new rules regarding production and transfer permits, raised an as-applied challenge to the validity of groundwater permits the District issued to *inter alia* Appellees Cimarron and CLM, and appealed the District's adverse actions on its own permit applications. [*Guitar I, Guitar II, and Guitar III*]. In the fourth administrative appeal, Guitar L.P. also raised an as-applied challenge to the validity of the groundwater permits issued to Robert L. Carpenter, Gail Carpenter, and Triple B. Farms and challenged the validity of the new rules. [*Guitar IV*].

In the trial court's final judgment entered on October 15, 2004, in the first three suits, consolidated under trial cause number 3703–205, the court upheld the validity of the District's new rules, the validity of the permits to Cimarron and CLM, and application of the new rules to Guitar L.P.'s permit applications. However, with regard to Guitar L.P.'s permit applications, the court held in favor of Guitar L.P. on its claim for a $9,399.34 refund of administrative fees in connection with administrative proceedings before the District's board and denied attorney and expert fees in *Guitar I–III*. On March 11, 2005 under trial cause number 3790–205, the trial court rendered a final judgment in *Guitar IV*, which upheld the validity of the District's new rules as well as the groundwater permits issued to the Carpenters and Triple B. Farms, but denied attorney fees to any of the parties.

## STATUTORY AUTHORITY

In Issues One and Three, Guitar L.P. challenges the validity of the District's 2002 Rules regarding transfer permit applications and production-based limitations for validation and operating permits, arguing that the District exceeded its statutory authority under Chapter 36 of the Texas Water Code.

Article 16, section 59 of the Texas Constitution imposes on the Legislature the duty to protect our state's natural resources. TEX.CONST. art. XVI, § 59(a). Pursuant to Section 59(b), the Legislature has the authority to create conservation districts to accomplish "the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the au-

thority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law." Tex. Const. art. XVI, § 59(b). Consistent with the objectives of Article 16, section 59, the Legislature has adopted Chapter 36 of the Texas Water Code "[i]n order to provide for the conservation, preservation, protection, recharging, and prevention of waste of groundwater, and of groundwater reservoirs or their subdivisions, and to control subsidence caused by withdrawal of water from those groundwater reservoirs or their subdivisions...." Tex.Water Code Ann. § 36.0015 (Vernon Supp.2006). Thus, the Legislature has declared groundwater conservation districts to be "the state's preferred method of groundwater management through rules developed, adopted, and promulgated by a district in accordance with the provisions of this chapter." *Id.*

■ Groundwater conservation districts are political subdivisions of the state. *See* Tex.Water Code Ann. § 36.001(15); *see also Bennett v. Brown County Water Improvement Dist. No. 1*, 153 Tex. 599, 272 S.W.2d 498, 500 (1954). As such, groundwater conservation districts have only such powers as are expressly granted by the statute and those powers that are necessarily implied in order to carry out the express powers given. *See Harris County Water Control and Imp. Dist. No. 58 v. City of Houston*, 357 S.W.2d 789, 795 (Tex. Civ.App.-Houston 1962, writ ref'd n.r.e.), *citing Tri–City Fresh Water Supply District No. 2 of Harris County v. Mann*, 135 Tex. 280, 284, 142 S.W.2d 945, 947 (1940)(holding that the district had no authority to issue bonds and levy taxes for fire protection equipment or a sewerage system where no such powers were expressly delegated to the district by the statute and such functions could not be implied from the powers expressly con-

ferred in the statute); *see also In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004); *Subaru of America, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex.2002).

*Standard of Review*

■ In order to determine whether the District has exceeded its statutory authority under Chapter 36, we must construe the relevant statutory provisions contained within the chapter. Statutory construction is a question of law subject to *de novo* review. *See Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002); *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex.1989). In construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. *See In re Entergy Corp.*, 142 S.W.3d at 322; *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002). We look first to the statute's plain and common meaning; if the statutory language is unambiguous, we will interpret the statute according to its plain meaning. *In re Entergy Corp.*, 142 S.W.3d at 322. However, if the statute is ambiguous, we then consider other matters to ascertain the Legislature's intent, including the objective of the law, the legislative history, and the consequences of a particular construction. *See* TEX.GOV'T CODE ANN. § 311.023 (Vernon 2005); *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003). The reviewing court "will not give an undefined statutory term a meaning that is out of harmony or inconsistent with other provisions in the statute." *McIntyre*, 109 S.W.3d at 745. Since questions of statutory interpretation are questions of law, we are not bound by an agency's construction of a statute and no presumption of validity attaches to it. *See Entex, a Div. Of Reliant Energy Resources Corp. v. Railroad Comm'n of Texas*, 18 S.W.3d 858, 862 (Tex. App.-Austin 2000, pet. denied). Further,

an agency's interpretation is entitled to serious consideration, only if the agency's construction of its statute is reasonable and does not contradict the statute's plain language. *See id.; see also Continental Cas. Co. v. Downs,* 81 S.W.3d 803, 807 (Tex.2002).

## GROUNDWATER REGULATION STATUTORY PROVISIONS

The Legislature has expressly granted certain rule-making powers to groundwater districts. In accordance with Section 36.101(a) of the Water Code:

A district may make and enforce rules, including rules limiting groundwater production based on tract size or the spacing of wells, to provide for conserving, preserving, protecting, and recharging of the groundwater or of a groundwater reservoir or its subdivisions in order to control subsidence, prevent degradation of water quality, or prevent waste of groundwater and to carry out the powers and duties provided by this chapter.[2]

Tex.Water Code Ann. § 36.101(a).

A district is required to consider all groundwater uses and needs during the rule-making process and must develop rules which are fair and impartial. *See* Tex.Water Code Ann. § 36.101(a).

Further, the Legislature has mandated that groundwater districts implement a permitting system "for the drilling, equipping, operating, or completing of wells or for substantially altering the size of wells or well pumps."[3] Tex.Water Code Ann. § 36.113(a). Section 36.116 provides a district with statutory authority to regulate by rule the production of groundwater by: setting production limits on wells; limiting the amount of water produced based on acreage or tract size; limiting the amount of water that may be produced from a defined number of acres assigned to an authorized well site; limiting the maximum amount of water that may be produced on the basis of acre-feet per acre or gallons per minute per well site per acre; or any combination of the methods listed above....[4] Tex.Water Code Ann. § 36.116(a)(2)(A)-(D), (F). In addition, the statute formerly provided that: "[i]n promulgating any rules limiting groundwater production, the district may preserve historic use before the effective date of the rules to the maximum extent practicable consistent with the district's comprehensive management plan under Section 36.1071."[5] Acts of 2001, 77th Leg., R.S.,

2. Every groundwater district must develop a comprehensive management plan and must adopt rules necessary to implement the management plan. *See* Tex.Water Code Ann. § 36.1071(a), (f).

3. An exemption applies to wells used solely for domestic use or for providing water for livestock or poultry on a tract of land larger than 10 acres that is either drilled, completed or equipped so that it is incapable of producing more than 25,000 gallons of groundwater a day. *See* Tex.Water Code Ann. § 36.117(b)(1). Further a district cannot restrict the production of any well that is exempt from permitting under Subsection b(1). *Id.* at § 36.117(c).

4. In 2005, the Legislature also added "managed depletion" as an allowable method for production limitation. Acts of 2005, 79th Leg., R.S., ch. 970, § 12, 2005 Tex.Gen.Laws 3247, 3258, now codified at Tex.Water Code Ann. § 36.116(a)(2).

5. Section 36.116(b) has been amended effective September 1, 2005, to state as follows: "In promulgating any rules limiting groundwater production, the district may preserve historic or existing use before the effective date of the rules to the maximum extent practicable consistent with the district's comprehensive management plan under Section 36.1071 and as provided by Section 36.113." Acts of 2005, 79th Leg., R.S., ch. 970, § 12, 2005 TEX.GEN.LAWS 3247, 3580, now codified at TEX.WATER CODE ANN. § 36.116(b).

ch. 966, § 2.50, 2001 TEX.GEN.LAWS 1991, 2015–16 [hereinafter "Tex.Water Code Ann. § 36.116(b)(2001)"].

Before determining whether to grant or deny a permit, the district must consider *inter alia:* whether the proposed use of water unreasonably affects existing groundwater and surface water resources or existing permit holders; whether the proposed use of water is dedicated to any beneficial use; and whether the proposed use of water is consistent with the district's certified water management plan. Tex.Water Code Ann. § 36.113(d). Further, the statute formerly provided that when granting a permit, the district may impose more restrictive permit conditions on new permit applications and increased use by historic users if the limitations:

(1) apply to all subsequent new permit applications and increased use by historic users, regardless of type or location of use;

(2) bear a reasonable relationship to the existing district management plan; and

(3) are reasonably necessary to protect existing use.[6]

Acts of 2001, 77th Leg., R.S., ch. 966, § 2.49, 2001 Tex.Gen.Laws 1991, 2015 [hereinafter "TEX.WATER CODE ANN. § 36.113(e)(2001)"].

If a permit application or a permit amendment proposes the transfer of groundwater outside of a district's boundaries, the district may promulgate rules requiring a person to obtain a permit or permit amendment under Section 36.113 for the transfer of groundwater out of the district. *See* TEX.WATER CODE ANN. § 36.122(a), (b). Except as provided in Section 36.113(e), the district may not im-

pose more restrictive permit conditions on transporters than the district imposes on existing in-district users. Tex.Water Code Ann. § 36.122(c). When reviewing a proposed transfer of groundwater out of the district, subsection (f) of Section 36.122 requires a district to consider:

(1) the availability of water in the district and in the proposed receiving area during the period for which the water supply is requested;

(2) the projected effect of the proposed transfer on aquifer conditions, depletion, subsidence, or effects on existing permit holders or other groundwater users within the district; and

(3) the approved regional water plan and certified district management plan.

Tex.Water Code Ann. § 36.122(f).

Under the statute, a district cannot adopt rules expressly prohibiting the export of groundwater, but it may limit a permit issued under Section 36.122 if the conditions in subsection (f) warrant the limitation, subject to Section 36.122(c). *See* Tex.Water Code Ann. § 36.122(f), (g), and (*o*). Further, in applying Section 36.122, a district "must be fair, impartial, and nondiscriminatory." Tex.Water Code Ann. § 36.122(q).

### DISTRICT RULES

Under its 2002 Rules, the District requires an operating permit or validation permit to withdraw or produce water from a non-exempt well or for the substantial altering of the size or capacity of a non-exempt well. District Loc. Rule 6.1(a). Operating permits are granted based upon surface acreage owned or controlled by an

---

**6.** In 2005, the Legislature amended Section 36.113(e), substituting "permit amendment applications to increase" for "increased." *Acts of 2005, 79th Leg., R.S., ch. 970, § 10,* 2005 TEX.GEN.LAWS 3247, 3256–57, now codified at TEX.WATER CODE ANN. § 36.113(e).

applicant and are available to those who have no validation permit covering the same acreage. DISTRICT LOC. RULES 6.10, 6.11. In granting or denying such permits, the District considers factors which are consistent with those outlined in Section 36.113(d). DISTRICT LOC. RULE 6.11. Under the Rules, operating permit holders are entitled to withdraw up to 4.0 acre-feet of water per acre based on the degree to which the Aquifer's average water elevation is greater than 3,580 feet. DISTRICT LOC. RULE 3.5(c)(2). Operating Permits are entitled to no water allocation if the Aquifer level is 3,580 feet or less. DISTRICT LOC. RULE 3.5(c)(2).

In contrast, validation permits take into account existing and historic use of groundwater in the district. DISTRICT LOC. RULE 6.12(a). Existing and historic use for irrigation purposes is based on the amount of acres irrigated during the existing and historic use period, which the District has defined as the period running from January 1, 1992 to May 31, 2002, and the average water elevation of the BS–VP Aquifer.[7] District Loc. Rules 1.1, 6.12(f), 6.12(h)(1). For all other non-exempt uses, the existing and historic use of groundwater is determined by the maximum amount of water beneficially used in any one calendar year during the existing and historic use period. District Loc. Rule 6.12(h)(2). Validation permit holders are entitled to 4.0 acre-feet of water per acres of existing and historic irrigated land for in-district irrigation if the Aquifer level is greater than 3,570 feet. DISTRICT LOC. RULE

3.5(c)(1). In the event the average water elevation is less than 3,560 feet, the District by resolution can establish a 3.00 acre-feet per acre per year water allocation for all validation permits of existing and historic use. DISTRICT LOC. RULE 3.5(4)(A). When the average water elevation is less than 3,570 feet, the water allocation for uses other than irrigation, is a pro-rata reduction of the amount recognized in validation permits of existing and historic use. District Loc. Rule 3.5(4)(B).

The District requires a transfer permit in order to transfer any groundwater produced or withdrawn within the district, and such permits are only available to applicants who hold either validation permits or operating permits.[8] District Loc. Rule 6.13(j). The water allocation for transfer permits is linked to the amount allocated under the underlying validation or operating permits. District Loc. Rule 3.7. Transfer permit water allocation is one hundred percent of the amount specified in the underlying permit if issued for non-exempt uses other than irrigation. District Loc. Rule 3.7(2). Otherwise, the water allocation for a transfer permit is subject to a leaching fraction (the amount of water that percolates back to the BS–VP Aquifer) reduction equal to 0.30 of the volume of irrigation water applied to the land. District Loc. Rules 3.7, 1.1

### ISSUES ON APPEAL

On appeal, Guitar L.P. attacks the District's 2002 Rules regarding water allocation for transfer permits, which none of the parties dispute is integrally linked to

---

7. Groundwater use for ranching is protected by exemption of wells for this purpose. Thus, ranchers can continue to use groundwater produced by their wells for their existing purposes without having to undergo the permitting process or have their consumption reduced. *See* DISTRICT LOC. RULE 7 (giving these wells the highest priority in the system).

8. The rules provide that a transfer permit application can be submitted and considered concurrently with an application for a validation permit, an operating permit or amendment to such permits. District Loc. Rule 6.13(k).

the allowable groundwater production the District permits under a landowner's underlying validation or operating permit. First, Guitar L.P. asserts that the District's transfer rules are impermissible under Section 36.113(e) because the linkage of a landowner's allocation of groundwater for transfer purposes to the amount of water that is allocated under a validation or operating permit imposes "more restrict permit conditions" on holders of operating permits and non-"existing and historic irrigated land" ("EHIL") validation permits who wish to transfer water outside the district. Relatedly, Guitar L.P. also challenges the District's statutory authority to implement the production limitations that form the basis of the underlying permitting system, which undisputedly favor prior use of groundwater for irrigation purposes based on the ten and one-half year period designated by the District. We will address this latter issue first.

■ As we stated above, Section 36.116 authorizes the District to regulate the production of groundwater, enumerating a number of acceptable methods for production-based limitations. *See* TEX.WATER CODE ANN. § 36.116(a)(2)(A)-(D) & (F). Guitar L.P. contends that none of the provisions allow a district to impose production limits based upon existing and historic use during a specific period. However, we believe that it is clear that the District's regulatory scheme for production limits is

based on a combination of the methods listed in the statute, namely, setting production limits on wells, limiting the amount of water based on acreage, and limiting the maximum amount of water that may be produced on the basis of acre feet per acre. *See* TEX.WATER CODE ANN. § 36.116(a)(2)(A)-(D) & (F). The District's authority to designate an existing and historic use period in order to protect historic use within its permitting scheme firmly rests in Section 36.116(b). We find that the plain language of Section 36.116(b) permits the District to preserve historic use in promulgating *any* rules limiting groundwater production to the maximum extent practicable consistent with the district's management plan.[9] *See* Tex.Water Code Ann. § 36.116(b)(2001). Therefore, the District has not exceeded its statutory authority to regulate groundwater production by establishing a permitting system that protects historic use of groundwater by allocating production limitations based on a landowner's groundwater use during a historic use period that pre-dates the effective date of the District's rules.

■ Guitar L.P., however, also challenges the District's authority to designate a specific historic use period under Section 36.116(b). Specifically, Guitar argues that the District's "general" authority to preserve historic irrigation does not constitute clear authority for the District to set production limits that preserve only irrigation

9. In its management plan, the District determined that the annual amount of groundwater being consumptively used within the District in 2001 was estimated to be 75,600 acre-feet. The best available information, however, suggested that 63,000 acre-feet per year is the long-term average amount of groundwater available for consumptive use or transfer from the District from the BS–VP Aquifer. The plan's objectives include the goal that the District will manage the production of groundwater from the BS–VP Aquifer within the District in a sustainable manner. Specifi-

cally, the plan states that the management objective is as follows: "The amount of groundwater withdrawals permitted by the District shall be consistent with the long-term sustainable amount of recharge to the portion of the aquifer within the District and to protect the historical and existing uses of groundwater withdrawn from the portion of the Bone Spring–Victorio Peak aquifer located within the District." *See also* TEX.WATER CODE ANN. § 36.1071(f)("The district shall adopt rules necessary to implement the management plan.").

use which occurred during a ten and one-half year historic period. We agree, of course, that the statute does not create a specific period for which a district "may preserve historic or existing use before the effective date of the rules ...," however, such a mandate would most certainly be untenable given the diverse needs that must be addressed by groundwater resources management among the State's local districts. *See* TEX.WATER CODE ANN. § 36.116(b)(2001); TEX.WATER CODE ANN. § 36.0015, 36.101(a), § 37.1071(a); *see also Railroad Comm'n of Texas v. Lone Star Gas Co.*, 844 S.W.2d 679, 687 (Tex.1992)(by conferring upon an agency the power to promulgate rules and regulations necessary to carry out the purposes of an act, the Legislature forecloses the argument that it intended to spell out the details of regulating the industry). The Legislature has provided local groundwater districts with the flexibility to designate a historic use period, in relation to its management plan, and, by necessity, impliedly authorized the District to define what constitutes the "historic use" to be protected.[10]

Tangentially, Guitar L.P. also asserts that the historic use period adopted by the District fails to preserve historic use "to the maximum extent practicable" given the region's history of irrigation which dates back to the 1940s. The record on appeal, however, provides ample evidence that the District has attempted to preserve historic irrigation use to the maximum extent practicable, including evidence that: current consumptive use of the BS–VP Aquifer is unsustainable, with 63,000 acre-feet per

year as the long-term average amount of groundwater available, thus requiring all users to reduce their consumption; the Aquifer recovered during decreased use during the 1980s; and that throughout most of the designated historic use period the BS–VP Aquifer was within the elevation of 3,570 to 3,580 feet found to be sustainable. Therefore, we reject this portion of Guitar L.P.'s challenge, as well as its overall challenge that the District exceeded its statutory authority under Chapter 36 when it adopted rules regarding production limitations that consider a landowner's prior use of groundwater for irrigation purposes during a specific historic use period.

We turn next to Guitar L.P.'s contention that the District exceeded its authority under Chapter 36 when it adopted transfer rules that are not authorized by Section 36.113(e) because they impose more restrictive permit conditions on non-EHIL landowners and are arbitrary and discriminatory. Essentially, Guitar L.P. attacks the District's linkage of a landowner's allocation of groundwater under a validation or operating permit to the amount of his groundwater allocation for transfer purposes, and in so arguing, claims that this linkage imposes a "more restrictive permit condition" within the meaning of Section 36.113(e) that applies only to non-EHIL landowners.

■ We first address Guitar L.P.'s indirect challenge to the District's authority to link its issuance of transfer permits to a landowner's production permits. Section 36.122 governs the transfer of groundwa-

---

**10.** Although not controlling here, we do note that the Legislature has recently amended Chapter 36, defining "Evidence of historic or existing use" to mean "evidence that is material and relevant to a determination of the amount of groundwater beneficially used without waste by a permit applicant during

the relevant time period set by district rule that regulates groundwater based on historic use." Acts of 2005, 79th Leg., R.S., ch. 970, § 2, 2005 Tex.Gen.Laws 3247, 3249–50, now codified at Tex.Water Code Ann. § 36.001(29).

ter outside of a district's boundaries. *See* TEX.WATER CODE ANN. § 36.122. As we previously noted, under Section 36.122(a), if a Section 36.113 permit application or permit amendment proposes the transfer of groundwater outside a district's boundaries, the district may also consider the provisions of Section 36.122 in determining whether to grant or deny the permit or permit amendment. Tex.Water Code Ann. § 36.122(a). The statute clearly authorizes a groundwater district to promulgate rules requiring a landowner to obtain a permit or permit amendment for the transfer of groundwater out of the district. *See* TEX.WATER CODE ANN. § 36.122(a), (b). However, except as provided in Section 36.113(e), the district may not impose more restrictive permit conditions on transporters than the district imposes on existing in-district users. Tex.Water Code Ann. § 36.122(c). By its plain language, the statute authorizes a district to establish a separate permit for water transfers, but it also permits a district to *consider* the provisions in Section 36.122 when determining whether to grant or deny any permits under Section 36.113 generally. *See* TEX.WATER CODE ANN. §§ 36.122(a), 36.113(a). Thus, there is nothing in Section 36.122 that requires a district to issue a transfer permit independently or without considering its determinations under a landowner's production permit.

■ Relying on Section 36.113(e), Guitar L.P. contends that the linkage of transfer permit groundwater allocation to a landowner's groundwater allocation under his validation or operating permit imposes "more restrictive permit conditions" on holders of operating permits and non-EHIL validation permits who wish to transfer their water out of the district. That is, it asserts, the different criteria or terms that landowners must satisfy to ob-

tain validation and operating permits are carried forward when they apply for transfer permits, and as a result are, in effect, "restrictive" conditions that do not apply to EHIL landowners. "By different criteria" or "terms" we understand Guitar L.P. to be arguing that the District's determination of historic irrigation groundwater use during the designated ten and one-half year existing and historic use period is the restrictive condition. We conclude, however, that Guitar L.P.'s reliance on Section 36.113(e) as the basis of its attack on the District's transfer provisions is misplaced.

As we noted before, Section 36.113 governs the permitting of wells. Tex.Water Code Ann. § 36.113(a). When granting or denying a permit, the district must consider *inter alia:* whether the proposed use of water unreasonably affects existing groundwater and surface water resources or existing permit holders; whether the proposed use of water is dedicated to any beneficial use; and whether the proposed use of water is consistent with the district's certified water management plan. *See* Tex.Water Code Ann. § 36.113(d). Former Section 36.113(e) provided that:

The district may impose more restrictive permit conditions on new permit applications and increased use by historic users if the limitations:

(1) apply to all subsequent new permit applications and increased use by historic users, regardless of type or location of use;

(2) bear a reasonable relationship to the existing district management plan; and

(3) are reasonably necessary to protect existing use.

Tex.Water Code Ann. § 36.113(e)(2001).

In essence, Guitar L.P. argues that because no landowner had ever transferred water outside the District at the time the 2002 Rules were adopted, all of the trans-

fer permit applications the District considered were "subsequent new permit applications" for the purposes of Section 36.113(e)(1) and therefore, the District's rules which link a non-EHIL landowner's groundwater allocation for transfer purposes to the amount allowable by his underlying validation or operating permit (which is substantially less than the allocation awarded to EHIL farmers), constitutes a more restrictive transfer permit condition that is not applied to EHIL farmer's transfer permit applications. Guitar L.P. contends that District's transfer rules are thus impermissible under Section 36.113(e).

We conclude, however, that Section 36.113(e) is not applicable in this case. When read in the context of the other provisions within Section 36.113, it is readily apparent that Subsection (e) merely functions as a protective measure, by which the Legislature has granted groundwater districts express authority to alter its permitting systems to impose "more," that is, additional, restrictive permit conditions on *new* permit applications and increased use by historic users, subject to certain qualifications listed in Subsection (e)(1)-(3) if future circumstances arise that warrant adjustments. We must agree with the District that this statutory provision serves as a safety valve for groundwater districts, in that it authorizes a district in later phases of groundwater regulation to "step up" its regulatory efforts in order to conserve and protect its groundwater resources.[11] Therefore, assuming, without deciding that having to satisfy the criteria for is-

suance of an underlying validation or operating permit, which presumably is a permit that offers EHIL-like water allocation, is a "restrictive permit condition" for non-EHIL transfer permit applicants, we find that Section 36.113(e) does not come into play until a district decides to require more, and perhaps tighter, restrictions within its permitting system to new applicants or to historic users who seek to increase their use. We find it of little import that as Guitar L.P. asserts in this case, no landowner had ever transferred water outside the district. We decide that this fact, standing alone, simply does not make all transfer permit applications "subsequent new permit applications" under the District's existing permitting system. We agree with the District that Section 36.113(e) does not address front-end distinctions between the types of permits issued under the District's current regulatory scheme for local groundwater development and conservation. Given this conclusion, we need not reach Guitar L.P.'s specific arguments regarding Section 36.113(e)(3). Issues One and Three are overruled.

## EQUAL PROTECTION

In its second issue, Guitar L.P. argues that both facially and as-applied to Guitar L.P., the District's transfer rules violate its right to equal protection under the United States and Texas Constitutions because they treat Guitar L.P. differently than other, similarly-situated landowners. *See* U.S. Const. amend. XIV, § 1; TEX. CONST. art. 1, § 3.

---

11. Moreover, this interpretation is consistent with provisions contained within Section 36.122, which permit a district to promulgate rules requiring a person to obtain a transfer permit or permit amendment under Section 36.113 to transfer groundwater out of the district on or after March 2, 1997 under a new arrangement, but prohibit a district from imposing more restrictive permit conditions on transporters than those imposed on existing in-district users, *except* as provided in Section 36.113(e). *See* Tex.Water Code Ann. § 36.122(a)-(c).

*Standard of Review*

We review Guitar L.P.'s equal protection challenge to the District's transfer rules under a rational basis test. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985); *see also City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *Barshop v. Medina Cty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 631–32 (Tex.1996). Under this test, the District's regulatory classification need only be rationally related to a legitimate state purpose or interest to survive an equal protection challenge. *See City of Cleburne,* 473 U.S. at 439–40, 105 S.Ct. at 3254; *Barshop,* 925 S.W.2d at 631.

Essentially, Guitar L.P.'s equal protection challenge rests on its claim that the District's transfer rules grant preferential treatment to EHIL farmers, that is, landowners who irrigated their land during the ten and one-half year historic use period, because they receive greater allocations of groundwater by virtue of their underlying validation permits over non-EHIL landowners who hold either validation or operating permits, which respectively entitle them to comparably smaller allocations based on prior non-irrigation historic use or no allocation until the BS–VP Aquifer reaches a certain average water elevation. Guitar L.P. asserts that EHIL farmers and non-EHIL landowners are similarly situated because neither class of landowner has ever transferred water outside the District. Moreover, Guitar contends that the classification in the District's transfer rules, which is based on the application of the historic use period, is not rationally related to any legitimate governmental purpose. We must ultimately disagree.

The Texas Constitution mandates that the Legislature preserve and conserve the natural resources of this state. *See* TEX. CONST. art. 16, § 59. Pursuant to Article 16, section 59(b), Legislature has created groundwater districts, which it has determined are the state's preferred method of groundwater management. TEX.WATER CODE ANN. § 36.0015. The Legislature requires that a district develop a comprehensive management plan in accordance with Section 36.1071. According to the District's management plan, 63,000 acre-feet per year is the long-term average amount of groundwater available for consumptive use or transfer from the District from the BS–VP Aquifer, 63,000 acre-feet is the long-term average amount of groundwater recharge from lateral inflow, and approximately 27,000 acre-feet of recharge results from deep percolation of irrigation water. The plan states that the Far West Texas Approved Regional Water Plan has determined that total maximum groundwater production in the Dell Valley aquifer system needs to be equivalent with recharge in order to maintain a balance. In terms of groundwater supply management, the plan provides that the District will manage groundwater production from the BS–VP Aquifer in a "sustainable manner" and that it will "identify and engage in such practices, that if implemented, would result in more efficient use of groundwater." As previously mentioned, the plan states as its management objective for natural resources as follows:

> The amount of groundwater withdrawals permitted by the District shall be consistent with the long-term sustainable amount of recharge to the portion of the aquifer within the District and to protect the historical and existing uses of groundwater withdrawn from the portion of the Bone Spring–Victorio Peak aquifer located within the District.

The District's operating and validation permitting rules protect historic use of

groundwater for irrigation purposes while taking into account the average water elevation of the BS–VP Aquifer in groundwater production and withdrawal. We think that is undeniable. *See* DISTRICT LOC. RULES 6.10, 6.12, 3.5. In order to implement what we find to be a production permitting scheme that is based on legitimate state purposes, namely, limiting groundwater withdrawals in a sustainable manner while protecting historical and existing uses of that groundwater, the District implemented the disputed ten and one-half year existing and historic use period. Given the integral role this historic period plays in affecting the District's legitimate goals, we must likewise conclude that the designated historic period is rationally related to the District's preservation goals.

Having determined that the underlying production permitting system is rationally related to a legitimate governmental purpose, we turn to the remainder of Guitar L.P.'s equal protection challenge. The crux of Guitar L.P.'s complaint is that for transfer permitting, the District has no rational basis for discriminating between otherwise similarly-situated landowners in order to protect the Aquifer or to protect historic use of groundwater for irrigation purposes because EHIL landowners have by that point effectively converted their historic type of use by requesting a transfer permit to export their groundwater allocation outside the district.

As previously discussed, the District requires all landowners to obtain a transfer permit in order to transfer any groundwater produced or withdrawn within the district. DISTRICT LOC. RULE 6.13(j). It also requires that transfer applicants hold either validation or operating permits. DISTRICT LOC. RULE 6.13(j). These rules apply to all landowners alike. The problem, however, is that water allocation for transfer permits is determined by the amount allocated under the underlying production permit. *See* District Loc. Rule 3.7. Thus, the non-EHIL/EHIL classification that Guitar L.P. protests occurs at the earlier production limitations phase of permitting. Consequently, the transfer rules do not "give" greater allocations of groundwater to EHIL landowners than what is allocated to other landowners, but rather the transfer rules incorporate the production limitations that are already legitimately in place. Despite Guitar L.P.'s contentions, the District's decision to adopt the pre-established groundwater production and withdrawal limitations does further the District's legitimate goal of limiting annual groundwater withdrawals for all non-exempt wells as the primary means of protecting the average water elevation level of the BS–VP Aquifer in a sustainable manner.[12]

Finally, Guitar L.P. also complains that the transfer rules allow EHIL landowners to "convert their existing use of groundwater for irrigation purposes to future transfer uses without satisfying any additional permitting conditions and without regard

---

**12.** We also note that the District's decision is also consistent with Section 36.122(f), which provides:

In reviewing a proposed transfer of groundwater out of the district, the district shall consider:

(1) the availability of water in the district and in the proposed receiving area during the period for which the water supply is requested;

(2) the projected effect of the proposed transfer on aquifer conditions, depletion, subsidence, or effects on existing permit holders or other groundwater users within the district; and

(3) the approved regional water plan and certified district management plan.

TEX.WATER CODE ANN. § 36.122(f); *see also* Tex.Water Code Ann. § 36.122(g), (k).

to the water level of the BSVP Aquifer." However, the District's transfer permit rules subject historic irrigation users to a leaching fraction reduction equal to 0.30 of the volume of the irrigation water that would have been applied to the land. *See* DISTRICT LOC. RULE 3.7, 1.1. This restriction is certainly in keeping with the District's goal of protecting the BS–VP Aquifer by maintaining its level of recharge, despite the inevitable loss of some irrigation groundwater within the district for out-of-district use. *See* TEX.WATER CODE ANN. § 36.122 (the district may not adopt rules expressly prohibiting the export of groundwater). Because the District's transfer permit rules do not deprive Guitar L.P. of equal protection under the United States and Texas Constitutions, we overrule Issue Two.

## VESTED RIGHTS STATUTE

In Guitar L.P.'s fourth issue, it contends that the District violated its vested rights by considering its permit applications under the District's 2002 Rules rather than its 1990 Rules that were in effect at the time Guitar L.P. filed its applications. Specifically, Guitar L.P. asserts that former Section 245.002(a) of the Texas Local Government Code required that the District consider its groundwater permit applications under the 1990 Rules.

Former Section 245.002(a), Uniformity of Requirements, contained in Chapter 245 of the Local Government Code provided that:

> Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the permit is filed.

Acts of 1999, 76th Leg., R.S., ch. 73, § 2, 1999 TEX.GEN.LAWS 431, 432, now codified at TEX.LOC.GOV'T Code Ann. § 245.002(a)(Vernon 2005).

With certain exceptions, Chapter 245 applies only to a project in progress on or commenced after September 1, 1997. *See* TEX.LOC.GOV'T Code Ann. §§ 245.003, 245.004. (Vernon 2005). "Project" is defined as "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." *See id.* at § 245.001(3). A "regulatory agency means" the governing body of, or a bureau, department, division, board, commission, or other agency of, a political subdivision acting in its capacity of processing, approving, or issuing a permit. *Id.* at § 245.001(4).

Guitar L.P. argues that its "project" triggered the protections of Section 245.002 because it " 'endeavored', among other things, to validate its existing wells and to transport water outside the boundaries of the District." Further, Guitar L.P. asserts that the District "extert[ed] jurisdiction" over its endeavor by assuming jurisdiction over the permit applications, which were required to complete their endeavor.

■ In their reply, Appellees CLM and Cimarron argue that Chapter 245 does not apply to groundwater regulation, but rather it is a general statute regulating the permitting process for certain types of real estate development and building projects and has only limited applicability. *See Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674, 683 (Tex.App.-Austin 2004, no pet.)(stating that the Legislature created a system of rights concerning the issuance of land-use permits in Chapter 245 to require each regulatory agency " 'to consider the approval, disapproval, or conditional approval' " of individual applica-

tions for permits based upon the land-use regulations " 'in effect at the time the original application for the permit is filed' "). We are inclined to agree with this argument, but only to the extent that a groundwater district has not adopted rules requiring a permit involving improvement or development of land, or land use generally. But, we do not need to reach this issue or the related issue of whether Guitar L.P.'s purported project falls within the purview of Chapter 245 because any applicability of Chapter 245 in this case is superseded by Chapter 36 of the Water Code.

The Legislature has specified that Chapter 36 "prevails over any other law in conflict or inconsistent with this chapter, except any special law governing a specific district. . . ." Tex.Water Code Ann. § 36.052 (Vernon 2000). In this case, application of Chapter 245 would be inconsistent with Chapter 36 because it would require the District to apply old rules that are no longer valid and that otherwise conflict with the regulatory requirements mandated under Chapter 36, as amended in 1997 and 2001. For example, Chapter 36 requires the District to develop a comprehensive management plan to address, as applicable: provision of the most efficient use of groundwater; control and prevention of groundwater waste; control and prevention of subsidence; conjunctive surface water management issues; drought conditions; and conservation. Tex.Water Code Ann. § 36.1071. Under Chapter 36, a district must adopt rules necessary to implement the management plan. TEX.WATER CODE ANN. § 36.1071(f). Further, before granting or denying a permit, the District must consider whether "the proposed use of the water is consistent with the district's certified water management plan." TEX.WATER CODE ANN. § 36.113(d)(4); *see also* TEX.WATER CODE ANN. § 36.122(f)(3)("In reviewing a proposed transfer of groundwater out of the district, the district shall consider . . . the approved regional water plan and certified district management plan."). None of the District's 1990 Rules regarding well permitting or groundwater transfer are keyed to the District's management plan, which as previously discussed, requires that the amount of groundwater withdrawals permitted must be consistent with the long-term sustainable amount of recharge to the BS–VP Aquifer.

Likewise, the District's old rules regarding out-of-district groundwater transfer violate the regulatory requirements mandated by Chapter 36. Section 36.122(c) prohibits the District from imposing more restrictive permit conditions on transporters than on in-district users. *See* Tex.Water Code Ann. § 36.122(c). The old rules, however, do just that. In particular, old District Rule 3.024(10) provided that:

> Such [transport] application shall not be approved unless the Board of Directors finds and determines that the transporting of water for use outside the District applied for will not substantially affect the quantity and quality of water available to any person or property within the District; that all other feasible sources of water available to the person requesting a permit have been developed and used to the fullest; that no other liquid could be feasibly substituted for the use of fresh ground water; and that the proposed use, or any part of the proposed use will not constitute waste as defined under the laws of the State of Texas. In evaluating the application, the District shall consider the quantity of water proposed to be transported; whether the ultimate destination of the water is within the recharge zone of the aquifer, thus promoting recharge of the aquifer; the term for which the trans-

porting is requested; the safety of the proposed transportation facilities with respect to the contamination of the aquifer; the nature of the proposed use; whether the withdrawal of the groundwater requested is reasonable; whether such withdrawal is contrary to the conservation and use of groundwater; whether the use of the water to be transferred is for beneficial purposes; whether alternative supplies are available; whether the transfer will negatively affect the surface and groundwater users near the proposed well sites; and such transfer is not otherwise detrimental to the public welfare.

*See* District Loc. Rule 3.024(10)(1990).

None of these onerous requirements applied to in-district users. Subsection 10 of old District Local Rule 3.024 clearly conflicts with Section 36.122(c). Guitar L.P. argues that even if this conflict exists, only those provisions in old Rule 3.024 that squarely conflict with Section 36.122 would be invalid and the remaining provisions would survive because the 1990 Rules include a severability clause. *See* District Loc. Rule 5.001(a)(1990)("the invalidity does not affect other provision or applications of the rule which can be given effect without the invalid provision or application. . . .").

▮ Generally, when a statute contains a provision of severability, that provision prevails in interpreting the statute. *See* TEX.GOV'T CODE ANN. § 311.032(a)(Vernon 2005). However, a severability clause will save the valid provisions of an otherwise invalid statute only if the remaining valid portion is capable of being executed in accordance with the apparent legislative intent independently of the invalid portion of the statute. *See Board of Trustees of Emp. Retirement System of Tex. v. Farrar*, 236 S.W.2d 663, 666 (Tex.Civ.App.-Austin), *affirmed by,*

150 Tex. 572, 243 S.W.2d 688 (Tex. 1951)(even if an act contains a severability clause, if the valid and invalid portions of an act are so interwoven that they cannot be separated so as to leave a complete act capable of being executed in accordance with the legislative intent, the entire act is invalid). Likewise under contract law, when the provision of an agreement to be severed is integral to the entire agreement, a severability clause, standing alone, cannot save the agreement. *See John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 87 (Tex.App.-Houston [14th Dist.] 1996, writ denied). In this case, subsection 10 of the District's old Rule 3.024 plainly states that no transport application will be approved unless the District's board makes the requisite findings contained in subsection 10, making the remaining provisions of the rule inextricably intermingled to compliance with this invalid portion. *See* District Loc. Rule 3.024(10)(1990). Therefore, we reject Guitar L.P.'s contention that the District's old Rule 3.024 does not conflict with the mandatory requirements of Section 36.122.

We determine that Chapter 36 more specifically governs the duties and powers of groundwater districts and that application of Chapter 245 in this case would be wholly inconsistent with the mandatory regulatory requirements contained in Chapter 36. Under these circumstances, Chapter 36 supersedes Chapter 245 and controls over the District's application of its 2002 Rules in determining Guitar L.P.'s pending permit applications. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex.2000)(under traditional statutory construction rules, the more specific statute controls over the more general). Issue Four is overruled.

### THE DISTRICT'S CROSS–APPEAL

By cross-appeal, the District raises three issues, in which it contends the trial

court erred: in denying its request for attorney and expert witness fees and other incurred costs; in ruling in favor of Guitar L.P. on its claim for a partial refund of administrative fees; and in assessing 25 percent of the court costs against the District.

■ The District argues that the trial court's failure to order Guitar L.P. to pay the District's stipulated attorney and expert witness fees, as well as its costs in preparing the administrative record for filing with the trial court, is contrary to the plain directive of Section 36.066(g). We agree.

Section 36.066(g) provides, in pertinent part:

> If the district prevails in any suit other than a suit in which it voluntarily intervenes, the district may seek and the court shall grant, in the same action, recovery for attorney's fees, costs for expert witnesses, and other costs incurred by the district before the court. The amount of the attorney's fees shall be fixed by the court.

Tex.Water Code Ann. § 36.066(g).

Guitar L.P. asserts that Section 36.066(g) is limited to qualifying "suits" and that as a matter of statutory construction, Section 36.066(g) does not apply to suits, such as this case, which are, in effect, administrative appeals. In so arguing, Guitar L.P. points to Section 36.102(d), which provides for attorney fees in any suit to enforce its rules and argues that if the District is correct, the mandatory award under Section 36.102(d) is mere statutory surplusage. *See* TEX.WATER

CODE ANN. § 36.102(d). Guitar L.P. claims that because Section 36.102(d) applies to a "suit to enforce [a water district's] rules," it follows that Section 36.066(g) cannot apply to every type of suit to which the District may be a party. Therefore, harmonizing Section 36.066(g) and Section 36.102(d) requires the Court to determine the type of suit to which Section 36.066(g) applies. According to Guitar L.P., Section 36.066(g) is limited to the types of suits mentioned within Section 36.066, not judicial challenges to the rules or appeals of administrative rule-making and adjudicatory decisions, as Guitar L.P. describes this case.

Here, Guitar L.P. filed suit to challenge the validity of the District's rules *after* all its administrative appeals to the District were final.[13] By its plain reading, there is nothing in Section 36.066(g) that limits the type of "suits" for which the District can seek and recover its attorney fees, expert witness costs, and other costs. Moreover, nothing in the provision excludes the suits described in Section 35.251. This construction of Section 36.066(g) is not inconsistent with other provisions in Chapter 36, including Section 36.102(d). Indeed, Section 36.102(d) merely clarifies that the District may recover these costs in the enforcement proceedings described in Section 36.102. Further, as the District rightly points out, it would not be a redundant provision in all cases, for example, a district may voluntarily intervene in another action, like a citizen's suit under Section 36.119 for the purpose of enforcing its rules. Under that circumstance, voluntari-

---

13. Section 36.251, Suit Against District:

A person, firm, corporation, or association of persons affected by and dissatisfied with any provision or with any rule or order made by a district is entitled to file a suit against the district or its directors to challenge the validity of the law, rule, or order. The suit shall be filed in a court of competent jurisdiction in any county in which the district or any part of the district is located. The suit may only be filed after all administrative appeals to the district are final. TEX.WATER CODE ANN. § 36.251.

ly intervening in a suit would preclude attorney's fees under Section 36.066(g), but such fees would be recoverable under Section 36.102(d). Thus, we conclude Section 36.066(g) clearly applies to Guitar L.P.'s suit and is mandatory.

■ Applying Section 36.066(g), the District asserts that it should be treated as the prevailing party in the consolidated cases because the trial court ruled in its favor as to Guitar L.P.'s principal challenges. Specifically, the District asserts that it won outright on the merits in *Guitar I, II,* and *IV* and in *Guitar III* (Guitar L.P.'s administrative appeal challenging the Board's decision to grant its permit applications), the District prevailed on the principal issue of the case, that is, whether the District legally applied its rules to Guitar L.P.'s permit application, and prevailed in the bulk of Guitar L.P.'s challenges to the District's fee assessments against it. In reply, Guitar L.P. asserts that even if Section 36.066(g) applies, the District did not wholly prevail in all of the appeals, arguing that because Section 36.066(g) does not contain any language that would allow the District to recover its attorney fees in a case where it "substantially prevails" or "prevails on any disputed issue," then it may only recover attorney fees if it prevails in the entire suit.

■ Courts have typically described a "prevailing party" as the party to a suit that either successfully prosecutes the action or successfully defends against it, prevailing on the main issue. *See Flagship Hotel, Ltd. v. City of Galveston,* 117 S.W.3d 552, 564–65 (Tex.App.-Texarkana 2003, pet. denied); *Hawkins v. Ehler,* 100 S.W.3d 534, 544 (Tex.App.-Fort Worth 2003, no pet.); *F.D.I.C. v. Graham,* 882 S.W.2d 890, 900 (Tex.App.-Houston [14th Dist.] 1994, no writ). Thus, the prevailing party is the party vindicated by the judgment rendered. *See Brown v. Fullenweid-*

*er,* 135 S.W.3d 340, 347 (Tex.App.-Texarkana 2004, pet. denied), *citing Dear v. City of Irving,* 902 S.W.2d 731, 739 (Tex.App.-Austin 1995, writ denied).

Clearly, the main issue in the litigation between the parties was the validity of the District's rules and its permit decisions. The trial court rendered a judgment in favor of the District on all of Guitar L.P.'s claims, with the exception of ordering a partial refund of administrative fees, which Guitar L.P. had incurred during the permitting proceedings. The District was without doubt the prevailing party in the litigation as it successfully defended against Guitar L.P. on the main issues of the four cases brought by Guitar L.P.

■ Guitar L.P., however, argues that the District waived any complaint about attorney fees because it failed to segregate those fees among the four separate cases in the trial court. Specifically, Guitar L.P. claims that the District had a duty to segregate the fees among the cases because each appeal involved a unique set of facts and issues. We disagree.

■ Generally, the party seeking to recover attorney's fees carries the burden of proof and must show that the fees were incurred on a claim that allows recovery of such fees and, thus, is ordinarily required to segregate fees by claim when there are multiple claims which may or may not allow the recovery of such fees. *See Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991); *Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture,* 50 S.W.3d 531, 550–51 (Tex.App.-El Paso 2001, no pet.). However, in this case, the District was entitled to recover attorney fees as to all of the claims Guitar asserted, not just some of them. Therefore, it had no duty to segregate the fees. Even if the District was under a duty to segregate, there is a recognized exception to the duty

to segregate fees when the attorney's fees rendered are in connection with multiple claims arising out of the same transaction. *Sterling*, 822 S.W.2d at 11. When the claims are dependent upon the same set of facts or circumstances and thus are " 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Id.* at 11. Here, the claims asserted *inter alia* the validity of the District's rules, the particular challenges to the District's permit application decisions in application of its rules, and fee assessment challenges, were substantially interrelated and arose from similar facts and theories of law. We conclude the District's attorney and expert witness fees could not have been practicably segregated among the cases. For the reasons stated above, the District was entitled to recover the stipulated attorney and expert witness fees.

▉ In its brief, the District also contends that it is entitled to recover the cost of copying the administrative record that was filed with the district court as part of its "other costs" under Section 36.066(g). Guitar L.P. asserts in response that costs associated with the administrative record are not "court costs," therefore the District cannot recover these costs under Section 36.066(g). To support its contention, Guitar L.P. relies on *City of Manvel v. Texas Dep't of Health Resources*, 573 S.W.2d 825 (Tex.Civ.App.-Beaumont 1978, writ ref'd n.r.e.), in which the Court held that costs of producing the administrative record in an administrative appeal are not to be treated as assessable court costs. Further, Guitar L.P. claims that "costs" is a term of art that specifically means "court costs" and that Section 36.066(g) should not be read as to expand its meaning. Under Guitar L.P.'s interpretation, "other costs" in Section 36.066(g) is limited to

"court costs," which does not include the costs of producing the administrative record. We find Guitar L.P.'s argument unpersuasive and its reliance on *City of Manvel* misplaced. In *City of Manvel*, the state agency sought to recover the cost of preparing the administrative record under TEX.R.CIV.P. 131. *See City of Manvel*, 573 S.W.2d at 828. The *City of Manvel* Court found that Rule 131 "costs" did not extend to administrative record preparation in the absence of statutory language directing otherwise. *See id.* at 828–29. Unlike *City of Manvel*, the statute at issue here expressly provides for other costs. By its plain language, Section 36.066(g) would include all other costs, without limitation to costs incurred at the trial court level. Therefore, we agree that in this case, the District was entitled to recover the cost of preparing the administrative record for filing with the district court. Because the trial court erred in failing to award the District its reasonable attorney fees and expert witness fees, as well as the other costs it incurred in preparing the administrative record for court filing, pursuant to Section 36.066(g), we sustain the District's first cross-issue.

In its next cross-issue, the District argues that the trial court's order in *Guitar III* that it refund Guitar L.P. $9,399.34 in administrative fees is contrary to substantial evidence in the administrative record that supports the District's assessment of its administrative fees against Guitar L.P. in the permitting proceedings.

▉ Section 36.253 provides for review of a groundwater district's decisions under the substantial evidence rule. *See* Tex.Water Code Ann. § 36.253; *see also* TEX.GOV'T CODE ANN. § 2001.174 (Vernon 2000). Under the substantial evidence rule, the reviewing court is not to substitute its judgment on the weight of the evidence for that of the agency's. *City*

*of El Paso v. Pub. Util. Comm'n,* 883 S.W.2d 179, 185 (Tex.1994); *see also* Tex. Gov't CODE ANN. § 2001.174. The agency's order is presumed valid and the complaining party bears the burden of showing that it was not supported by substantial evidence. *Id.; Hammack v. Public Util. Comm'n of Texas,* 131 S.W.3d 713, 725 (Tex.App.-Austin 2004, pet. denied). "At its core, the substantial evidence rule is a reasonableness test or a rational basis test;" if the order is reasonable, we do not concern ourselves with its correctness. *City of El Paso,* 883 S.W.2d at 185, *citing Railroad Comm'n of Texas v. Pend Oreille Oil & Gas Co.,* 817 S.W.2d 36, 41 (Tex. 1991). The substantial evidence review requires " 'only more than a mere scintilla' " to uphold the order. *Montgomery Indep. Sch. Dist. v. Davis,* 34 S.W.3d 559, 566 (Tex.2000). That is, the evidence may actually preponderate against the agency's decision, yet amount to substantial evidence, if some reasonable basis exists in the record for the agency's action. *City of El Paso,* 883 S.W.2d at 185.

Under Section 36.205(a), a district may set fees for administrative acts of the district, such as filing applications. *See* TEX.WATER CODE ANN. § 36.205(a). Fees set by a district may not unreasonably exceed the cost to the district of performing the administrative function for which the fee is charged. *Id.* The District has established rules on assessment of administrative fees pursuant to the authority granted in Section 36.205(a). Specifically, District Local Rule 8.1 authorizes the Board to set reasonable fees for administrative acts such as reviewing and processing permits and conducting permit hearings, as long as the fees do not unreasonably exceed the cost to the District for

such matters. DISTRICT LOC. RULE 8.1. Rule 8.4 requires an applicant whose validation, operational, or transfer permit has been determined to be administratively complete by the Board to deposit with the District an amount determined by the Board to cover the cost associated with an uncontested or contested hearing regarding the permit. DISTRICT LOC. RULE 8.4. This advance deposit "shall be sufficient to pay for the cost of public notices, legal fees, expert fees, hearing facility rental fees, and other expenses." *Id.* The remaining deposit balance, if any, is refundable following approval of the permit. Moreover, the applicant may be required to deposit additional funds if the amount of the original deposit is expended prior to the Board's action on the permit. *Id.*

In this case, Guitar L.P. claimed that the District undercredited Guitar L.P. $5,600 in deposits and overcharged Guitar L.P. $3,720.44 in expenses, for a total of $9,320.44.[14] Guitar L.P. contends the trial court rightly determined that there was no substantial evidence to support the District's refusal to refund these under-credits and overcharges.

First, Guitar L.P. claims that it was entitled to a $5,600 credit for two "deposits" it made on October 29, 2002 and on November 1, 2002, for $4,300 and $1,300, respectively. However, the record clearly showed that these amounts were paid to the District as flat fees to administratively process Guitar L.P.'s two permitting applications. Because these were flat fee amounts, not deposits to a "deposit account," as Guitar L.P. claims, Guitar L.P.'s contention concerning under-crediting is without merit.

14. Guitar L.P. concedes that the total of all its alleged under-credits and overcharges is less than the amount the District was ordered to refund. Also, Guitar does not challenge the District's fee structure for permitting applications nor does it challenge the District's method of assessing its attorney and expert consultant fees in the permitting process.

Next, Guitar L.P. claims that in the underlying bills related to the permitting proceedings, the District improperly assessed some of its attorney and expert consultant fees against Guitar L.P. Guitar L.P. argues that it was overcharged $1,358.73 ($450 and $908.73) for the attorney fees the District incurred for attorney Renea Hicks. The record shows that the District had agreed at the administrative level that Guitar L.P. was overcharged $450 for Hick's May 2003 statement, and this amount was subsumed in later assessable fees and expenses for Hick's services in 2004, which amounted to $1,820.30. Guitar L.P. also claims an overcharge of $908.73, arguing that Hick's December 26, 2003 statement shows that he only worked a total of 0.7 hours for the District and that this work was not attributable to administrative matters. However, Hick's December 26, 2003 statement attached to General Manager Randy Barker's affidavit provides evidence that Hicks performed 3.7 hours on Guitar L.P.'s administrative proceedings, which with related expenses totaled $908.73. With regard to Guitar L.P.'s complaint about overcharges in the amounts of $71.33, $256.60, and $949.77 for the District's fees incurred for attorney Timothy Brown's work, there is evidence in the record to support the total costs assessed for his services, namely Brown's cover letters which designated the attributable parties.

Finally, Guitar L.P.'s claim of overcharges for Al Blair's services to the District is also without merit. Blair's invoices plainly show that the District incurred the disputed amounts of $609.01 and $475, which were attributable to Guitar L.P.'s administrative proceedings. We decline to accept Guitar L.P.'s tortured comparative reading of Blair's invoices and Brown's statements for their services over the same time period. Because Guitar L.P. failed to show there was a lack of substantial evidence regarding the District's assessment of fees against Guitar L.P. at the administrative level, the trial court erred in ordering the $9,399.34 refund. Cross–Issue Two is sustained.

In its third and final cross-issue, the District argues that the trial court erred in assessing 25 percent of the court costs against the District because it was the successful party in *Guitar I–III*. Specifically, the District contends that Guitar L.P. should have paid all the court costs and that the trial court failed to find good cause for apportioning the court costs as required by Rule 141 of the Texas Rules of Civil Procedure.

 Absent an abuse of discretion, the trial court's assessment of costs will not be reversed. *Seelbach v. Clubb*, 7 S.W.3d 749, 764 (Tex.App.-Texarkana 1999, pet. denied). Rule 131 of the Texas Rules of Civil Procedure provide that "[t]he successful party to a suit shall recover of his adversary all costs incurred therein. . . ." Tex.R.Civ.P. 131. Under Rule 141, the trial court "may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules." Tex.R.Civ.P. 141. We find that the District has failed to preserve its issue regarding taxation of costs because it failed to make a timely objection. *See* TEX.R.APP.P. 33.1(a)(1). Relying on *City of Irving v. Dallas/Fort Worth Int'l Airport Bd.*, 894 S.W.2d 456 (Tex.App.-Fort Worth 1995, writ denied), the District argues that Rule 131 establishes its entitlement to costs and thus, no motion is required in order for them to be awarded. Indeed, the City of Irving Court held that Rule 131 entitles the prevailing party to an award of costs regardless of whether they moved for them. *City of Irving*, 894 S.W.2d at 470–71. *City of Irving*, however, is silent on the waiver

issue presented here. We conclude that the District has waived its complaint on the trial court's adjudication of costs. Cross–Issue Three is overruled.

For the reasons stated above, we reverse the trial court's judgments as to the denial of the District's attorney's fees, expert witness fees, and other costs and as to the partial refund order in the amount of $9,399.34 for administrative costs and remand the cases to the trial court for further proceedings consistent with this opinion. In all other respects, the trial court's judgments are affirmed.